Filed 9/8/15  In re Nina I. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Nina I., a Person Coming Under the Juvenile Court Law. | B259133 |
| _____ | (Los Angeles County Super. Ct. No. DK04579) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| DEANNA I., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Nancy Rabin Brucker, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel for Plaintiff and Respondent.

===========

Deanna I. (mother) appeals an order declaring her daughter, Nina I., a juvenile court dependent and ordering Nina placed with R.I. (father). Mother contends the juvenile court's findings were not supported by substantial evidence, allegations concerning father should not have been dismissed from the petition, and the juvenile court should have granted mother visitation to allow her to reunify with Nina. We conclude the record was replete with evidence that Nina had suffered, and would continue to suffer, serious emotional damage as a result of mother's conduct. Further, mother lacks standing to raise the dismissal of the jurisdictional allegation concerning father and forfeited the issue of visitation by representing to the juvenile court that she was not currently seeking visitation. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Prior Child Welfare History

Nina (born May 2001) is the only child of mother and father. The Los Angeles County Department of Children and Family Services (DCFS) initially became involved with the family in May 2012, when it received a referral alleging physical and emotional abuse of Nina. That referral was closed as inconclusive. DCFS received six subsequent referrals alleging physical, emotional, and/or sexual abuse of Nina between August 2012 and March 2014. Some of those allegations were deemed unfounded; others remained under investigation when the present case commenced.

### II.

### The Present Referral

On November 15, 2013, DCFS received a referral alleging physical abuse of Nina by father. When a children's social worker (CSW) arrived at the family home, she observed a sign taped to the sliding door with the statement, "[R.] [father] is morally bankrupt." Mother requested to speak with the CSW in her car because she did not feel comfortable talking in the home, and she reported that both father and Nina were sociopaths and that Nina had run away from home because of father. According to mother, Nina was out of control and it was best for Nina to be detained in foster care.

2

Nina's school counselor told the CSW that the family was very dysfunctional. She said Nina had been doing well in school when mother was not living in the home, but that Nina's grades had dropped from A's and B's to F's when mother moved back home.

Nina told the CSW that things were better when mother was not living at the home. Nina said both parents had mental health issues and that she thought she was going to be like them. When the caseworker assessed Nina for suicidal ideation, Nina burst into tears and admitted that she had thought about suicide a week earlier because "life has no meaning anymore." Nina said she had never attempted suicide and was not currently suicidal, but believed she would have suicidal thoughts again. Nina said she would rather go into foster care than live with both parents.

A team decision making (TDM) meeting was held November 22, 2013, during which a voluntary family maintenance plan was initiated. Subsequently, in December 2013, Nina wrote a suicide note and mother had her involuntarily committed to a psychiatric hospital. Nina later said she had not wanted to kill herself, but wanted to scare her parents because she was upset with them. In January 2014, Nina told a CSW that she had thought about hurting herself and had spoken to a friend about it.

In February 2014, mother brought her laptop and recording devices to the CSW's office to play recordings for her. Mother said she thought Nina was delusional and that "something was wrong with her." She also had concerns that father was "abusing" Nina because according to mother, he would "snap" and yell at Nina. Mother said father had brainwashed Nina and turned Nina against her, and that Nina had "Stockholm syndrome" as a result of father's abuse. Mother also said father had been tracking and recording mother for years, including monitoring her internet usage. Mother became upset when the CSW would not agree that father had put a recording device in the palm tree outside mother's home office, and said that if the CSW did not believe her, she "would have to make better attempts to find recordings to show [the] CSW."

Nina's therapist, Mary Klem, said she had no concerns that Nina was delusional or mentally ill, and she felt mother was projecting her own issues onto Nina. She believed

3

Nina was angry about her volatile home environment and was failing in school to retaliate against her parents.

Mother's therapist, Dr. Murphy, reported that in May 2012 she had diagnosed mother with panic disorder, acute stress disorder, partner relational problem, and parent child relational problem. Dr. Murphy did not believe mother was delusional or paranoid. She believed father was trying to undermine mother and that mother had characteristics of a battered woman. Dr. Murphy agreed that it seemed somewhat neurotic for mother to hide recording devices in her home, but said mother did it because no one believed her.

In February 2014, the police were called to the family's home two nights in a row. On the first occasion, Nina said mother took her laptop, and when she went to retrieve it from mother's room, she saw one of mother's recording devices. As Nina went to get the recorder, mother came towards her, pushed her to the ground, and tried to choke her. Nina called for her father, who pulled mother off her. On the second occasion, mother called 911 because she believed Nina had stolen her purse. Nina said she was afraid of mother, who she described as "strange and unpredictable." She said she felt safe with father, and she did not fear mother when father was home.

In March 2014, Nina's teacher, Mrs. Young, reported that Nina had written a letter in which she said it was hard to focus in class because of what was going on at home. Nina wrote about her parents arguing, father's drinking, and mother's prescription drug use.

Nina's school counselor, Rachel A., reported that Nina had come to school crying and had said she did not feel safe at home after the February laptop incident. Rachel A. reported there were "awful family dynamics in the home and that she had been aware of the family's issues for some time." Nina had told Rachel A. that she "felt safe with her father, however was concerned about her mother's paranoia." Rachel A. also said mother had reported that Nina was manic and bipolar, but Rachel A. believed mother "was projecting onto Nina as she had not seen Nina with any manic or bipolar behavior although it seemed that mother had some behavior like that."

4

In March 2014, mother called Nina's therapist and said she believed father was sexually abusing Nina. The therapist said she had "grilled" Nina and did not believe she had been sexually abused. The same month, father told the CSW that mother had accused him of taking her hard drive, voice recorder, and cell phone. Father said he had not taken any of those items, but that shortly after mother accused father of the theft, he found that she had cut into a wall to gain access to his locked room and had taken items from him.

In March 2014, father filed for divorce and sought a restraining order against mother, and mother moved out of the family home. Nina reported that things "really improved" after her mother moved out. Nina said she knew mother was claiming father had sexually abused her, but those allegations were untrue.

In April 2014, DCFS recommended that Nina be detained from mother and placed with father. DCFS noted that during the time the case had been open, mother had "demonstrated bizarre behavior which has further added to the dysfunction in the home. While residing in the household, [mother] reports that she felt father was monitoring her, tracking her internet usage, that he installed a key logger onto her computer to document what she was typing, and installed a camera in a palm tree outside one of the windows in the home to observe her. Due to mother's suspicions of father, she began to hide recording devices throughout the home to document the father. . . . In addition to recording conversations of the family, mother has reported that she feels that father is a sociopath so she began writing manifestos and editing the recordings she made of the family to support her beliefs."

### III.

### Petition and Detention Hearing

On April 15, 2014, DCFS filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (c),[1] alleging mother had mental and emotional problems, the parents engaged in ongoing domestic disputes in Nina's presence, and the parents emotionally abused Nina.

A detention hearing was held on April 15, 2014. The court found a prima facie case for detaining Nina from mother and ordered Nina released to father pending a further hearing.

### IV.

### Jurisdiction/Disposition

#### A.    *Jurisdiction/Disposition Report*

In May 2014, a dependency investigator (DI) interviewed the family. Mother told the DI she knew father was having an affair with the man next door because she had placed a recording device along the fence between her home and the neighbor's. She claimed to be suffering from post traumatic stress disorder as a result of "uncovering the things I found out about this guy (referring to father)." Mother claimed that she did not have any mental or emotional problems, but said she was experiencing anxiety and depression because father was "basically dangling [her] child over the balcony."

Mother said she and father rarely argued, but that father and Nina "abuse each other and say it's me. They can lie to everyone else but they can't lie to me." Mother denied ever telling Nina she was mentally ill.

Father said mother had had several surgeries during their marriage for which she had been prescribed painkillers, including hydrocodone and oxycodone. He believed

---

[1]    All subsequent undesignated statutory references are to the Welfare and Institutions Code.

The petition initially included allegations under section 300, subdivision (a), but those allegations were later stricken.

6

mother may have been taking more of those drugs than she had been prescribed and that she had begun imagining things, perhaps because of long term use of prescription painkillers. He said mother placed recording devices throughout the house and spent "all day making videos, editing videos . . . all geared towards portraying me and Nina as bad people."

Nina said mother recorded everything that went on in the house, and that she and father continued to find recording devices in the house. Nina said she did not wish to participate in visitation with mother "until [mother] gets mental help," that she "can't even stand the thought of being in the same room with [mother]," and that at the present time she did not wish to have even telephone contact with mother.

Nina's therapist, Mary Klem, reported as follows: "While both parents have expressed their love and concern for Nina, their abusive relationship with one another has taken a toll on Nina. The mother's paranoid behaviors and constant recording of the family's conversations undermined Nina's ability to trust, feel secure and focus on school achievement. Nina is openly hostile with her mother. She is marginally angry with her father. Since the mother moved out, Nina appears to have a more positive attitude and outlook on her life. She appears relaxed and comfortable in father's presence. I believe the more the reactivity of the home decreases, Nina will be more motivated to focus on her abilities and strengths." Klem recommended that father maintain custody of Nina as her "sense of safety and security is evident when in the presence of father," and that mother's initial contacts with Nina occur with a therapist present, with "[p]rogress of reunification [to] dictate schedule of visitation."

Based on the foregoing, DCFS recommended that Nina be declared a juvenile court dependent and placed with father, that mother be given family reunification services, and that an Evidence Code section 730[2] evaluation be ordered of the family. On June 5, 2014, the juvenile court appointed a psychologist to evaluate the family.

---

[2] Evidence Code section 730 provides: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party

7

On August 21, 2014, Nina told the DI that she had not had any contact with mother. She said she had begun to feel like she wanted to see mother, but after meeting with the section 730 evaluator and learning of some of mother's accusations, she no longer wanted any contact.

*B.     Hearing*

The juvenile court held a jurisdiction/disposition hearing on September 16, 2014. As amended at the September 16, 2014 hearing, the petition alleged:

(b-2): "The child Nina [I.]'s mother, Deanna [I.], has mental and emotional problems, including [d]epression and [a]nxiety, which render the mother incapable of providing the child with regular care and supervision. Such mental and emotional problems on the part of the mother endanger the child's physical health and safety and place the child at risk of physical harm and damage."

(c-1): "The child Nina [I.]'s mother, Deanna [I.], emotionally abused the child by engaging in ongoing domestic disputes with the father in the child's home, in the child's presence, causing the child emotional distress, resulting in the child's suicidal ideation and psychiatric hospitalization. Further, the mother has made false allegations of sexual abuse of the child by the child's father, has reported to school staff that the child suffers from mental and emotional problems, and has made disparaging remarks about the child's father. Such emotional abuse of the child on the part of the mother places the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal, and aggressive behavior towards herself or others."[3]

_____

may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

[3]     As originally pled, paragraph c-1 alleged that both parents caused Nina serious emotional damage. At the jurisdiction/disposition hearing, the count struck the allegations against father in count c-1. As set forth in section II of the Discussion below, mother contends the court erred in striking father from the c-1 count.

Mother requested a contested hearing on the amended petition. Mother testified that she did not currently have a relationship with Nina. She said she would like to have a relationship with her daughter, but it was "up to [Nina]." She agreed that her relationship with father was over, and said that whether she and Nina would continue to have a relationship depended on "whether or not [Nina] wants to see [her]." She said the family was involved in dependency proceedings because "my ex husband is manipulating my daughter to make false accusations against me."

At the conclusion of the testimony, counsel for DCFS and for Nina argued that the allegations of the petition had been proven. Mother's counsel disagreed, asserting that Nina was not currently at risk of harm because mother "is divorcing the father. She's moved away. She moved away before this case even came before this court. She has her own residence. And she's leaving it up to her daughter in regards to visitation. *My client's not seeking any visitation at this time*." (Italics added.) Mother's counsel also told the court that mother's "main focus" was the subdivision (c) allegation, which asserted that mother emotionally abused Nina. As to that allegation, "It's my client's position that this child is being abused, but it's not by her alone. It's by her and the father. There are statements from the minor . . . where she says 'just being around them together was pretty bad.' This is not a situation where all the blame should be put on the mother. . . . [¶] . . . [¶] . . . It is [mother's] position that it's not her alone which has caused this child emotional harm, but it's that the father is to blame as well."

The court sustained the allegations of the petition, noting that "[t]he court does not have to be a psychiatrist in a case such as this or have a professional degree to make a finding that, a, the child has suffered mental and emotional issues as a result of the activity in this case; or b, to make findings with respect to the mother." Further, "to the extent that there's an argument here that there's no current risk because the mother has moved out of the home and is not, at this particular point, asking for visitation is pretty much disingenuous. And more importantly, I find that the mother has no credibility on this issue. She has, in the court's view, and I think the evidence is fairly clear, an untreated mental illness which, if not appropriately treated, will continue. And there is

9

no doubt in the court's mind that if the court were to buy into [mother's counsel]'s argument and dismiss the petition, that mother will be right back in the child's face and the father's face doing exactly the same thing. . . . [¶] Finally, there's no more credible evidence of the risk that mother poses than the fact that at this particular point the child is doing much better since . . . the mother's been out of the home and not in the child's life." Therefore, the court sustained the b-2 count as pled and the c-1 count as amended.

The court took a brief recess to read the section 730 evaluation prepared by Dr. Nancy Kaser-Boyd before holding the disposition hearing. It then ordered Nina removed from mother and placed with father, and ordered father, mother, and Nina to participate in individual counseling. The court said it was not in Nina's best interests currently to have visitation with mother, and said that if visits occurred in the future, they should occur in a therapeutic setting in consultation with Nina's therapist.

Mother timely appealed.

## DISCUSSION

Mother contends: (1) The juvenile court's jurisdictional findings are not supported by substantial evidence; (2) Father "should not have been dismissed from [the section 300, subdivision (c)] count and should have been found equally culpable;" and (3) The juvenile court abused its discretion by failing to order visits between mother and Nina. For the reasons that follow, mother's contentions are without merit.

## I.

### Substantial Evidence Supports the Juvenile Court's
### Jurisdictional Findings

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) In so doing, "we look to the entire record for substantial evidence to support the findings of the juvenile court. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Instead, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order and affirm the order even if there is other evidence supporting a

contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re A.M.* (2010) 187 Cal.App.4th 1380, 1387-1388.)

Mother asserts the evidence is insufficient to sustain the juvenile court's jurisdictional findings. She claims there is nothing in the record to support the conclusions that Nina has suffered or is in danger of suffering serious physical harm (§ 300, subd. (b)), or serious emotional damage (§ 300, subd. (c)). We address only the latter contention, " 'since the juvenile court's jurisdiction may rest on a single ground.' (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.)" (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83.)

A child comes within the jurisdiction of the juvenile court under section 300, subdivision (c) if he or she "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian. . . ."

In the present case, there is abundant evidence that Nina has suffered, and is at substantial risk of continuing to suffer, serious emotional damage. Nina admitted to her caseworker that she had thought about suicide in the past because "life has no meaning anymore," and that she feared the suicidal thoughts would return. In December 2013, she wrote a suicide note and was involuntarily committed to a psychiatric facility. Although Nina claimed she wrote the note because she was upset with her parents, she told her social worker that she subsequently had thoughts about hurting herself.

There is also abundant evidence that mother's conduct was the source of much of Nina's emotional distress. Mother placed recording devices throughout the house, had a physical altercation with Nina, accused father of a sexual affair with a neighbor and of sexually molesting Nina, urged DCFS to place Nina in foster care, and called 911 to report that Nina had stolen her purse. All of this conduct plainly had a detrimental effect on Nina's mental health: Nina's grades plummeted when mother moved back into the family home, and Nina told several trusted adults that she was afraid of mother,

11

describing her as "strange and unpredictable." Nina's therapist opined that the parents' combative relationship had "taken a toll" on Nina, and that mother's "paranoid behaviors and constant recording of the family's conversations undermined Nina's ability to trust, feel secure and focus on school achievement."

Finally, all the evidence before the court demonstrated that Nina's emotional health improved after she ceased contact with mother. Nina told her school counselor that things "really improved" after her mother moved out of the home, and Nina's therapist reported that after mother moved out, Nina "appear[ed] to have a more positive attitude and outlook on her life." For all these reasons, substantial evidence supported the juvenile court's exercise of jurisdiction under section 300, subdivision (c).

Mother's primary attack on the juvenile court's jurisdictional findings is based on her own testimony and the statements of her therapist, Dr. Murphy, who mother says "at no time[] indicated that [mother] had mental and emotional problems that would interfere [with] her care of Nina or would place Nina at risk of physical harm." Even if we were to agree with mother's characterization of this testimony, an issue we do not reach, the law is clear that " '[i]f the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*In re R.V.* (2015) 61 Cal.4th 181, 217.) Stated differently, "[t]he fact that contrary evidence exists . . . is not the test." (*K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1383-1384, fn. 7.) Mother's evidence, therefore, does not undermine the juvenile court's jurisdictional findings.

## II.
## Mother Lacks Standing to Appeal Father's
## Dismissal From the Petition

Mother contends that even if we find substantial evidence supported the juvenile court's exercise of jurisdiction over Nina, we should conclude that the court erred in striking father from the c-1 allegation of the petition because "[t]here was a plethora of evidence about father's behavior towards [mother], the arguments they both engaged in, . . . and the effects of father's behavior and conduct on Nina."

12

Mother lacks standing to raise the dismissal of the allegations concerning father. "Standing to appeal extends only to a 'party aggrieved' by the order appealed from. ([§ 395]; Code Civ. Proc., § 902; *In re Aaron R*. (2005) 130 Cal.App.4th 697, 703; *In re Crystal J*. (2001) 92 Cal.App.4th 186, 190-191.) 'To be aggrieved, a party must have a legally cognizable immediate and substantial interest which is injuriously affected by the court's decision. A nominal interest or remote consequence of the ruling does not satisfy this requirement.' (*In re Carissa G*. (1999) 76 Cal.App.4th 731, 734 (*Carissa G*.).)" (*In re J.T*. (2011) 195 Cal.App.4th 707, 717.)

Whether a person has standing to raise a particular issue on appeal depends on whether the person's rights were injuriously affected by the judgment or order appealed from. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034 (*Cesar V*.).) Thus, "a parent is precluded from raising issues on appeal which did not affect *his or her own rights*. [Citations.]" (*In re Jasmine J*. (1996) 46 Cal.App.4th 1802, 1806, italics added.)

Mother has not explained how omitting father from the petition can have any affect on her rights, either now or in the future. Indeed, striking father from the c-1 allegation had absolutely no effect on mother's rights because it did not affect either the court's exercise of jurisdiction over Nina or its dispositional orders as to mother. Thus, mother has not put forward a legally cognizable interest that would allow her to challenge the omission of father from the petition, and she lacked standing to raise the issue.

### III.

### The Juvenile Court Did Not Abuse Its Discretion by
### Denying Mother Visitation with Nina

Mother contends the juvenile court erred when it denied mother visitation with Nina, finding that visits were not in Nina's best interests. Mother forfeited the issue by conceding it in the juvenile court. " 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture, also referred to as "waiver," applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings. [Citations.]' (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 221-

13

222.)  *A party may not assert theories on appeal which were not raised in the trial court.*
(*Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1489.)"  (*Kevin R. v.
Superior Court* (2010) 191 Cal.App.4th 676, 686, italics added.)

Mother testified in the juvenile court that she was not currently seeking visitation
with Nina because Nina needed to "decide . . . for herself" whether she wished to have a
relationship with mother.  The juvenile court expressly relied on mother's testimony
when it ordered no visits between mother and Nina, stating that it "[took] mother at her
representation that she's not intending to have visits at this time."  Thus, mother not only
did not object to the court's order denying her visitation—she expressly assented to it.
Under these circumstances, mother may not raise the issue of visitation on appeal.

## DISPOSITION

The juvenile court's September 16, 2014 order is affirmed.


## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



EDMON, P. J.


We concur:



ALDRICH, J.




JONES, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to
article VI, section 6 of the California Constitution.